Majority Report in eavor of Montanye.
In Assembly, January 19th, 1847.
Mr. T. Smith, from the committee on privileges and elections, to which was referred the petition of Isaac L. Hasbrouck, of the county of Ulster, praying to be admitted to the seat occupied by John D. L. Montayne in this House, reported that a majority of the committee were against the prayer of the petitioner, as follows:
Report of the Committee on Peivile&es and Elections on the petition of Isaac L. Hasbrouck, praying to be admitted to the seat in the House of Assembly, now occupied by John D’ L’ Montanye. '
The committee to whom was referred the petition of Isaac L. Hasbrouck praying to be admitted to the seat in this House, now occupied by John D’ L’Montanye, report: That they have had the' same under consideration.
That the said Isaac L. Hasbrouck, and the said John D’ L’ Mon-tanye appeared before your committee and agreed that the statement *184 of the proceedings of the board of comity canvassers of the comity of Ulster as set fórtli in the protest of the minority of said board, accompanying the petition of said petitioner, and hereunto annexed marked'A. is correct.
From that statement it appears that the whole number of votes allowed by said board to said John D’ L’ Montanye was four thousand two hundred and fifty-four, and the whole number allowed to said Isaac L. Ilasbrouck, was four thousand two hundred and fifty-three, thereby electing the said Montanye by one majority.
It further appears that there w»s returned by the board of canvassers from district No. 1 of the town of New-Paltz, one vote for J. D. L. Montanye, but the ballot was not returned.
Also from district No. 3 in the town of Marbletowu one vote for John Montanye, two votes for John Y. L. Montanye, and one vote for J. D. L. Montanye, but the ballots were not returned.
All of which votes were allowed to said John D’ L’ Montanye by said board in making up the whole number above specified.
It further appears, from said statement, that there was returned from district No. 1 of the town of Wa warsing two votes for. John L. Ilasbrouck, but the ballots were not returned, and one vote from district No. 1 in the town of Kingstown for J. L. Ilasbrouck and the ballot not returned.
That tlie said board allowed to said Isaac L. Ilasbrouck the last named vote for I. L. Hasbrouck, but rejected -the'two votes for John L. Ilasbrouck.
It was also admitted by said parties, or their counsel before your committee, that there was no other family by the name of Montanye in the county of Ulster beside that of the sitting member except that of one Abraham Montanye.
It was also admitted that Hasbrouck was a very common name in said county, and it was asserted by the counsel of said John D’ L’ Montanye, but not admitted or proved, that there was a person by the name of John L. Hasbrouck residing in said county.
Your committee, after hearing the arguments of counsel and the admission of the parties as above set forth, on motion of Mr. Watson, adopted unanimously the following resolution.
Resolved, That we will receive no evidence of any matters back of the ballot-boxes, but will determine the matter in question of the contested seat between John D’ L’ Montanye and Isaac L. Hasbrouck upon the ballots which were actually cast, and will receive all evi *185 dence relative to the action of town and county canvassers in counting and canvassing the votes' given.
There being no other proof offered by either party, your committee proceeded to decide said matter upon the above statement of facts.
It was contended on the - part of the petitioner, first, that all the votes allowed to the parties by the board of county canvassers in which the names of the candidates were not written or printed at full length, and where the ballots were not returned, should have been rejected as defective ballots upon the ground that the statute requires all such ballots to be returned by the town, inspectors.
The language of the statute imposing this duty upon the inspectors is in these words, i£ They shall also attach to such paper the original ballots rejected by them as being defective.” (1 R. S. page 141, §42, 3d edition).
It may be somewhat of a question what constitutes defective ballots within the meaning of the statute, but a majority of your committee deem it unnecessary to discuss or decide that question in this case, inasmuch as all the ballots which the petitioner insists were defective were allowed to each candidate except the two for John L. •Hasbrouck, and we are to presume that they did not reject those as being defective, but refused to allow them to the petitioner because they could not construe John to mean Isaac.
It is also insisted on the part of said petitioner that no ballots should have been allowed for either of the candidates under the provisions of the act of 1842 prescribing the form of the ballot except such as contained their names, written or printed, at full length, and his counsel refers to the printed forms and directions of the then Secretary of State, Ool. Young, prepared under, this statute as authority for such construction.
The language of that Statute is as follows: “ The ballot shall be a paper ticket, which shall contain, written or printed, or partly written or partly printed, the names of the persons for whom the elector intends to vote,” &c.
"With all due deference to the opinion of the late able and learned Secretary of State, a majority of your committee cannot come to the conclusion that it was the intention of the framers of that law that no votes should be thereafter allowed except such as contained the names of the candidates written or printed at full length. Such a course would be a departure from all former laws, and from the pre *186 cedents which have almost invariably been established both in this State and the Congress of the United states upon this subject.
To warrant us in putting the construction contended for by the petitioner upon this Statute, we must assume that J. D. L. Mon-tanye and I. L. Has'bi;ouck are not names. Mow, every day’s experience convinces us that these are regarded as names. Many persons use only the initials of their Christian names in the transaction of all' their business. The presidents and cashiers of banks, and the makers of bills of exchange and promissory notes in many instances, and in some cases invariably use the initials for the Christian name, and yet who ever heard it pretended that such signatures did not contain the names,of the officers or makers. If the Legislature intended that the names should be written out or printed at full length upon the ballot, it appears to a majority of your committee that they would have said so in express terms; and in the absence of any such language your committee are inclined to give it the construction above indicated.
This brings your committee to the- consideration of the second question raised by the. counsel for the contestant, viz : That the Board of County Canvassers erred in allowing to said John D’ L’ Montanye the vote for John Montanye, the two votes for J. I). L. Montanye; and the two votes for John Y.'L. Montanye, for the reason that they do not sufficiently express the intention of the electors.
It is ui-ged in support of this position, that D’ L’ Montanye is a Erench name, and that D. L. instead of being middle letters, are a part of the surname.
A majority of your committee can hardly justify themselves in making so nice a distinction as to say that the omission of the apostrophe after the letters D. and L., or in other words converting the name from French to English without changing a letter, should deprive the elector of his vote. Probably not one in a hundred, and perhaps not one in a thousand,, on hearing the name of the candidate John D’ L’ Montanye, would in writing the name use the apostrophe.
In addition to this, a majority of your committee understood it to be admitted by the -parties, that when the surname of the sitting member is mentioned in the county where lie resides, he is generally called Montanye, and not D’ L’ Montanye, and that he usually goes by the name of John Montanye.
In relation to the objection of allowing the votes containing the *187 initials of the Christian names of the parties, a majority of your committee consider that question as having been too long and well settled, both by judicial decisions and Legislative precedents, to admit of any reasonable doubt.
It is true, the decision of the last House of Assembly, denying a seat to Epenetus Crosby, in the place of George T. Pierce, may form an exception to this rule, but it must be borne in mind that that decision was made in opposition to a very able report of a committee, a majority of whom was composed of the political friends of the then sitting member, and if the majority of that House intended to base their decision upon the ground, that votes containing only the initial letters of the Christian names, should in no case be allowed, a majority of your committee believe the decision to have been wrong, and ought not to be followed as a precedent.
Among the numerous precedents to be found upon this point sustaining the opinion of a majority of your committee, they would refer to the case of Bovee, decided in this House in 1826, where votes given for M. J. Bovee, were allowed by a body claiming to be Democratic, to Matthias J. Bovee, giving him a seat over Alexander Sheldon, the sitting member.
The Supreme Court, in the case.of Yates.v. Eerguson, sent the question to a jury, to decide whether votes given for H. Er Yates, were not intended for Henry E. Yates, and the jury decided they were so intended. (See 8th Cowen Reports, 102.)
A majority of your committee are, therefore, of the opinion, that the board of county canvassers decided correctly, in allowing the two votes returned for J. D. L. Montanye, and the vote for I. L. Has-brouck, to the respective candidates.
It is also insisted that the vote returned for John L. Montanye, and the two votes for John1 Y. L. Montanye, should not have been allowed to him.
This seems to bring up the question, how the middle letter or letters in a name are to be regarded ? In deciding this, we find the following principles established by our judicial tribunals: The law knows only one Christian name. (5th Johnson’s Reports, 84, Erank-lin v. Talmadge.) In law, a middle letter in one’s name is no part thereof. (1st Hill’s Reports, 102, Miller v. Christian.) An initial letter between the Christian and surname of a person, is no part of the name, and the omission is not a misnomer or variance. (4 John. Rep., 119, note A.)
*188 If these principles of law are correct, the}' not only establish the fact that the vote for John Montanye was properly allowed, but also the two votes for John Y. L. Montanye, for if the middle letters are not to be regarded as part of the name, then omitting one or both of them could not vitiate the votes. But independent of the legal decisions upon this subject, it is not pretended that there is any other John Montanye, or auy John Y. L. Montanye, in the county of Ulster, to whom these votes could apply. A majority of your committee are of the opinion, that the using of the Y, instead of D, arose entirely from the similarity of the sounds of the two letters, and led to the mistake in writing the letter Y, instead of D, and that no impartial mind can avoid coming to the conclusion, that these two votes, as well as the vote for John Montanye, were all intended for John D’ L’ Montanye, the sitting member.
The two votes returned to John L. Hasbrouck and rejected by the board of county canvassers, involve an entirely different question. John Hasbrouck is not, and cannot be turned or tortured into Isaac Hasbrouck. The material name — the Christian name, is wrong, and the majority of your committee know of no law or precedent that would justify them in allowing the two last mentioned votes. It would be too great a stretch of the imagination to suppose that the elector in voting for John meant Isaac. There may be many John Hasbroucks in the county, to whom that ballot might apply.
A majority of your committee, therefore, recommend the following resolutions:
Resolved, That Isaac L. Hasbrouck is not entitled to the seat as member of Assembly from the County of Ulster now occupied by John D. L. Montanye, and that the petitioner have leave to withdraw his petition.
Resolved, That John D’ If Montanye is entitled to the seat now occupied by him as member of Assembly.
All of which is respectfully submitted.
THOMAS SMITH.
ARDEN WOODRUFF.
A. S. UPI-IAM.
Messrs. Watson and Raplee dissent from this report.
*189 (A.)
PROTEST.
The subscribers, members of' the board of canvassers of the comity of Ulster, protest against the decision of the majority of said board, whereby it was declared that John D’ L’ Montanye was elected one of the members of Assembly of this county, at the election held in this county on the third day of November instant.
The grounds of our protest are as follows :
The whole number of votes returned by the boards of canvassers in the different towns, were for Isaac L. Hasbouek, four thousand two hundred and fifty-two (4,252).
For John JD’ L’Montanye, four thousand two hundred and forty-nine (4,249). Showing a majority for Isaac L. Hasbrouck, over the said John D’ L’Montanye of three votes.
There was also returned by the board of canvassers, from district No. 1, of the towrn of New Paltz, one vote for J. D. L. Montanye, but the ballot was not returned.
Also, from district No. 3, of the town of Marbletown, one vote for John Montanye, two votes for John V. L. Montanye, and one vote for J. JD. L. Montanye, but the ballots were not returned.
Also, from district No. 1, of the town of "VYawarsing, two votes forh John L. Hasbrouck, ballots not returned.
Also, from district No. 1, of the town of Kingston, one vote for J. L- Hasbrouck, ballot not returned.
Of these votes so returned, the board of county canvassers allowed to the said John D’ L’Montanye, the vote for John Montanye, the two votes for John Y. L. Montanye, and the two votes for J. D. L. Mon-tanye ; and this increased his vote to four thousand two hundred and fifty-four votes. They also allowed to said Isaac L. Hasbrouck, the vote for I. L. Hasbrouck, thus jncreasing his vote to four thousand two hundred and fifty-three votes; but rejected two votes for John L. Hasbrouck.
Admitting, for sake of argument, that the two votes for J. D. L. Montanye, and the one vote for I. L. Hasbrouck were correctly canvassed, notwithstanding they were not returned as defective ballots; yet the votes for John Montanye, and John Y. L. Montanye, are, in our opinion, not legal votes for John D’ L’ Montanye, because, the surname of the said John D. L. Montanye is D’L’Montanye, and not Montanye; the Christian name is John, and not D. L. Therefore, those votes ought not to have been allowed by the board of county *190 canvassers as given for the said John D’L’Montanye. And that if those votes had been rejected, the said Isaac L. Hasbi’ouck would have had a majority of two votes, and thus have been declared duly elected as a member of Assembly from the county of Ulster.
JOHN B. DAVIS, Supervisor of Olive.
JAMES RUSSEL, Supervisor of Saugerties.
REUBEN DEYÓ, Lloyd.
JOHN BLANSHAN, Rosendcole.
MOSES SOHOONMAKER, Rochester.
JOHN D. CROOK, MarTbroxogh. ■
(B.)
Petition to ti-ie House oe Assembly oe the State oe New Yoek.
The undersigned, Isaac L. Hasbrouck, of the county of Ulster, respectfully represents, that at the annual election, held in and for the said county of Ulster, on the third day of November, last past, he was duly and rightfully elected a member of the Assembly of this State, and ought, and should have been declared so to be elected by the board of county canvassers, and have received the certificate of election from said board of canvassers accordingly. The facts to sustain his claim and title to a seat in the present House of Assembly, are fully stated and set forth in the annexed protest of a minority of the said board of county canvassers, and is herewith presented. And the undersigned alleges, that notwithstanding he received a majority of all the votes cast at said election for member of Assembly, the certificate of election, was, in violation of his rights, and contrary to the law of the laifd, delivered by the said board to John D’L’Montanye, who was by said board, declared to be duly elected a member of Assembly for said county of Ulster. The undersigned, therefore, respectfully asks that he may be admitted to his seat in your honorable body, as a member from the county of Ulster, to which he conceives himself legally entitled.
Respectfully submitted.
ISAAC L. HASBROUCK.
Dated January 5th, 1841.
Assembly Documents, 1841, vol. 1, No. 16.
Ordered, That the said resolutions be laid on the table, and that said report be printed.
Assembly Journal, vol. 1, 1841, page 113.-
*191 MINORITY REPORT IN FAVOR OF Mr. HASBROUCK.
Mr. Watson, from the minority of the committee on privileges and elections, to which was referred the petition of Isaac L. Has-bronck, praying to be admitted to the seat now occupied by John D. L. Montanye, reported favorably to the prayer of the petitioner, as follows :
Report of the Minority of the Committee on Privileges and Elections, WITH REGARD TO THE CONTESTED ELECTION IN ULSTER COUNTY.
The undersigned, a minority of the standing committee on privileges and elections, to whom was referred the petition of Isaac L. ITasbrouck, praying to be admitted to the seat in the Assembly, now occupied by John D’ L’Montanye, respectfully submit the following report:
Mr. ITasbrouck was the regularly nominated and recognized candidate of one, and Mr. D’ L’Montanye of the other of the two-political parties into which the people are divided. Mr. ITasbrouck of the democratic, and Mr. D’ L’ Montayne of the whig party.
Mr. ITasbrouck, by his true full name, received four thousand two hundred and fifty-two votes. Mr. D’ L’ Montayne in like manner by his true full name received four thousand two hundred and forty-nine votes, leaving upon the canvass of these undisputed and unequivocal votes, a majority of three votes for Mr. Hasbrouck. This canvass rejecting the equivocal or defective votes, clearly entitled Mr. Hasbrouck to the certificate of election. The right of Mr. E’ L’ Montanye to the certificate, therefore depended, and still depends upon the allowance to him of a sufficient number of equivocal or such defective votes to overcome the three majority of regular votes for Mr. Hasbrouck. The number of such vote cast at the election was. eight, viz: Por John Y. L. Montanye two, for J. D. L. Montanye two, for John Montanye one, for I. L. Hasbrouck one, and for John L. Hasbrouck two. That these votes were cast appears in the statements contained in the certificates of canváss returned by the boards of district inspectors of election, but in neither case was the ballot containing the defective or doubtful .name returned by the district inspectors to the board of county canvassers as the statute requires. These votes were considered by the board of county canvassers erroneously. In considering them, the board allowed to Mr. D’ L’ Montanye the two votes given for John V. L. Montanye, the two given for J. D. L. Montanye, and the one given for John Montanye, thereby adding *192 five to the number of his regular votes, and giving him a majority of two over the number of Mr. Iiasbrouck’s regular votes. The board rejected the two votes given for John L.'Hasbrouck, but allowed to Mr. Hasbrouck the one given for I. L. Hasbrouck, still leaving the number of his votes one below the number so allowed to Mr. D’ L’ Montanye. Basing their action upon this state of facts, the board of county canvassers awarded and delivered the certificate of election to Mr. D’ If Montanye.
The minority of your committee are of the opinion, that in so considering and allowing those irregular or defective votes, and in certifying their determination that Mr. D. L. Montanye was by such votes “duly elected,” the board of county canvassers acted erroneously and without proper authority of law. The minority of your committee will presume to submit some considerations in, support of their opinions.
The act entitled “ an act respecting elections other than for militia and town officers,” passed April 5th,' 1842, prescribes the manner of conducting the general elections to be held in this State, and of canvassing the votes and certifying the results. It also declares who shall be district inspectors of election, and who. shall be county canvassers, and prescribes with minute precision their respective powers and duties. The opinion expressed is.founded upon a consideration of the facts presented, in connection with the provisions of the before mentioned act.
In the formation of this act, the Legislature in several of its provisions recognized the judicial character of several of the duties of the board of county canvasser in considering the votes and certifying their determination, and for the reason that their duties were judicial in their character, in the exercise of which they were to determine and declare the sovereign will of the people in the only legal mode provided for its expression, the Legislature to avoid uncertainty, misapprehension or doubt, prescribed by the statute, the evidence, and the only evidence upon which the county canvassers should act:
First. The statute declares that the vote or “ ballot shall be a paper ticket, which shall contain written, or printed, or partly written and partly printed, the names of the persons for' whom the electors intend to vote.” (Section 8, article 2, title 4, of the act.)
Second. The statute requires that the district inspectors “shall securely attach to a statement of such canvass (their canvass for the district) one ballot of each kind found to have been given for the *193 officers to be chosen at such election, any or either of them, and they shall in words at full length immediately opposite such ballot, and written partly on such ballot, and partly on the paper to which it shall be attached, the whole number of all the ballots that were received which correspond with the one so attached, so that one of each kind of the ballots received at such election, shall be attached to such paper with a statement of such canvass.” (Section 42, article 4, title 4 of said act.)., ,
Third. The last clause of the same section, last cited, requires that “ they (the district inspectors) shall also attach to such paper the original ballots rejected by them as being defective, which were given at such election.”
Fourth. Section 44 of the same title and article last cited, prescribes what the statement of the district inspectors shall contain, and among other tilings requires that it shall contain “at the end thereof a certificate that such statement is correct in all respects.”
Fifth. The last clause of the same section requires that the certificate shall be subscribed by the inspector.
Sixth. Section 48 of the same article and title, requires that “ the original statement, duly certified, shall be delivered by the inspectors or by on'e of them, to be deputed for that purpose, to the supervisor of the town or ward within twenty-four hours after the same shall have been subscribed.”
Seventh. That no district shall be deprived of its vote through defects or omissions shown by such statements. Section 15 of article 1, title 5, of the act makes it the duty of the board of county canvassers to send back a defective statement by one of their number deputed for that purpose, to the town canvassers, to have the same corrected, and to adjourn from day to day till his return, not exceeding three days.
This statement of the provisions and requirements of the statute shows not only that the Legislature prescribed and limited the kind of evidence which the board of county canvassers should receive and act upon, but it also exhibits the great caution and scrupulous care with which the statute was drawn. It should be regarded and administered by the boards of county canvassers with the like caution and care, unswayed by political desires or personal pique. It was unquestion ably1 the object and design of the Legislature to make the statute so plain, and yet so stringent, as to furnish a full protection against ‘the declaration of improper results, founded upon construc *194 tive votes, and induced by political preferences, partisan feelings, or personal animosities; and to secure, under all circumstances in which an election may be held — however active the political. contest, or ardent the political excitement may be, the true and undoubted result of all the legal and proper votes deposited in the ballot-box, in a form to impose confidence and command obedience. The whole fabric of elective government rests upon an. inflexible adherence to a faithful practice of this principle.
The ballot shall contain the name of the person for whom the elector shall intend to vote; so says the statute. The object was to procure from the elector himself the written or printed evidence of his intention ; evidence to be presented to the eye of those whose rights or duty might require them to judge of and give construction to it; ■evidence unalterable, and by well' established rules, unexplainable and not to be contradicted; evidence standing alone, its own and only guide to its application. If it shall contain the name of the person for whom the elector intended it, all well, whether the person be or be not a regular candidate. If the elector, for his own reasons, shall inscribe his ballot with a name similar to, but not that of a candidate, it is his own business. If he shall unfortunately err in the name which he writes or prints on his ballot, it is his misfortune. In either case he must abide by it, and no one else has a right to complain. In neither case lias the candidate a right to claim it, and say “that means me.” If he should make the claim,-ask him the question, “do you own the name?” He would not dare answer “yes,” for that would admit that all other votes given, bearing his name, were wrong; such answer would be untrue, for the name would not be the name of his person. In short, if the ballot does not contain the name of the candidate it cannot be legally allowed to him. How what is the proper meaning of the word “name,” as used and intended in this statute under such a construction as it should receive in view of its objects and of the manifest care and caution with which it was made ? Certainly nothing less than, or different from, the full designation of the individual as he would- himself write it, distinguishing him from every other person. Such must be the construction of the word “ name,” as used in the statute; for it was the design of the statute to require a ballot which would thus unquestionably distinguish and designate the person for whom it should be given from all others.
Apply this construction to the case under consideration ; suppose *195 the sitting member should be ashed for his foil autograph, he would doubtless write it “ John D’ L’ Montanye,” for that is the name which he claims, and uses, and by which he is known and distinguished, and was voted for. His certificate of election contains that name, and he appears and takes his seat and oath of office under it. He acknowledges no initial V. in his name. He is too much of a Frenchman to be Dutch enough for that, notwithstanding he comes from the neighborhood of Esopus. How, then, can a ballot containing the name “John V. L. Montanye” be legally so altered or changed, (not in fact but by construction), as to read “John D. L. Montanye ? ” It cannot be done, unless the letters Y and D shall be transposed, in their uses in the language, and periods and apostrophes shall be substituted for each other. "Written language is not so flexible, V is not D, nor is it possible for it in its proper use as an initial, to indicate the same name; and the well established rules of written evidence forbids the transmutation performed by the board-of county canvassers. The similarity or identity even of the remaining part of the name, cannot avoid or change the rule of evidence controlling it, nor can the fact that J. D. L. Montanye was a regular candidate avail against its application. The ballot must stand alone; it is the vote, the act of one man. The votes of others, no matter what the number may be, cannot aid in, or change the construction of it. There is no legal connection between them ; my vote is not yours, nor yours mine; my vote cannot be construed by yours, nor yours by them all put together. The attempt to do it would be folly, and the effect, if successful (as iu this case) might be falsehood. The like rule applies to the two ballots containing the name “ J. D. L. Montanye.” How did the board of county canvassers know that the “ J.” in each of-those ballots stood for “John?” J. does not always stand for John. There are a score of names with that initial; suppose these ballots shown to a stranger, he would' not have known whether 'the J. stood for James, or Joseph, or Jacob, or J osliua, or Jeremiah, or Jared, or Jethro, or Jedutliam, or Jeliosaphat, or John, or any other equally euphonious name beginning with J.; nor whether the J. in each case meant the same name or person; nor could he have ascertained without parol evidence, obtained from the voter, or from some person who knew his intention. The members of the board of county canvassers, were, in the performance of their duty as such board, to look upon and judge of those ballots as strangers to all parties, personal and political. Had they done so,, they *196 would háve had no evidence to guide them to the conclusion which they adopted, that the J". on each of those ballots meant John. The same rule, applies to the vote given for I. L. Hasbronck ; I. does not always indicate Isaac; one vote was given for “John Montanye,” which was allowed to John I). L. Montanye, the sitting member. This vote was allowed to him at the expense of the proudest part of his cognomen, as well as in violation of the rules of written evidence before stated. Montanye, is no more the name of D. L. Montanye, than Burén is of Van Burén — than Connell is (?’Connell, or Fayette is La Fayette, whose name by the way was De La Fayette, precisely the prefix abbreviated in the name of Mr. D. L. Montanye, a very common abbreviation in writing French proper names. The prefix D’L’. is common to all the family bearing the name, which may be, and doubtless is, -for the sake of brevity and ease of pronunciation among persons speaking exclusively the English language, frequently called “ Montanye ; ” some from long neglect of its use in speaking, may have dropped it in writing the name, but not so with 'the sitting member, or his immediate connexions, as he admits.
If the minority of your committee are correct in the construction of the word “ name,” as used in the statute (and they submit that it is the only-rule that will insure certainty and safety), then the board of county canvassers plainly erred in allowing to either candidate any of the imperfect votes mentioned. If, for the sake of obtaining votes, contractions and inferences could change Ninto D — make J beyond a doubt, mean John, and I mean Isaac, and render visible D’ L’ where they never were ; then the same causes might, with the same reason and propriety', change John into Isaac, and allowed to the contestant the benefit of the two votes given for John L. ITasbrouck; that would have elected, as the regular votes did elect him, a member of the Assembly. The rule presented by the minority of your committee does not militate against the instructions of the Secretary of Sute, to allow votes given by well known abbreviations as Geo. for George, and Thos. for Thomas. Such votes apply as certainly to the individuals as if the name was fully written, and. certainty is the object sought by the statute.
But supposing, for the sake of the argument, that the board of county canvassers possessed the right and power to alter or extend by construction, the language or meaning of those imperfect votes, then the question arises, had the board the necessary evidence before them, to authorize them to consider those votes at all? or, in other *197 words, bad the board jurisdiction to take cognizance of them in tbe manner in which they were presented? Had they the evidence required by the statute under which they were acting, to show that any votes containing such names were in fact given ? The minority of-your committee are of the opinion that they had not. -The statute1 requires that the defective ballots shall be attached to the original' statements made and returned by the district inspectors. The object' of that provision is clear, and is founded upon another well-established rule "of evidence, that is, that parol evidence shall not be received or admitted, to prove the contents of any written or printed instrument, but that the instrument itself must be'produced. The vote itself is the best, yea, the only proper evidence of its contents, and with that view of it the statute requires the vote to be returned for the .inspection of the board of county canvassers. It may be said that the statement of the district inspectors is written evidence of the contents of the vote. That cannot properly be so, for it is against the requirement of the statute and the principle on which it is founded. Such statement is mere parol evidence, sufficient, it is true, to prove the fact that the vote.was given, and its identity, when produced, facts properly provable by parol, but not of its contents. Those can onty be shown by its production and exhibition. It is true that the district inspectors act under oath, but that does not change the rule establishing the degree of evidence required by the statute, however true their statement may be. A witness in court may swear with entire accuracy to the contents of a written instrument in his possession, and even give a literal copy, yet it would not be received, because the instrument itself containing a higher degree of evidence would be within reach. His evidence would be good to prove the existence of the paper, but not the contents of it, the cases are parallel. The same principle is seen in the provision requiring one of each of several like votes given, to be attached to the statement of the district inspectors. ' In that case, the contents of all are seen by the contents of the vote returned. That there may be no error or change committed, part of the statement returned must be written upon the ballot attached.
That being done, the inspector’s statement is evidence of the number of like votes given.
It was contended by the counsel for the sitting member, that tire statute requiring the return of the ballot itself was merely directory, and that a non-compliance did not prohibit the board of county can- *198 vaásers from considering the votes as described in the statements of the district inspectors.
What has already been said, shows that such a position cannot be correct; that it stands in direct opposition to the design and purpose of the statute, and beside, the statute is in terms mandatory, and the object of the mandate is to procure the best evidence, a sort of subpoena cluces tecum, to bring the ballot, for a disobedience whereof, the district inspectors would be liable to an action on the case, at the suit of any party injured thereby.
A brief reference to several other provisions of the statute having reference to the same design, certainty, will show the fallacy of this position so "assumed by the sitting member. Suppose no ballots at all should be attached to a statement of the district inspectors as required by the statute, could the board of county canvassers consider and canvass the votes according to the contents of it ? Clearly they could not. Suppose such a statement should not contain the certificate that it was “ correct in all respects,” as required by the statute, could it be received, and the votes specified in it be allowed by the board of county canvassers ? Clearly they could not. Again, suppose that such a statement should not be subscribed by the district inspectors, as required by the statute, could it be pretended that it should be received and considered at all ? The very mention of such a proposition shows how absurd and preposterous it is. Yet the requirements of the statute is alike.mandatory in each case, and any principle which would dispense with one, would dispense with all. There is, however, still another provision in the statute, showing the correctness of the opinion of the minority of your committee on this subject.
They now refer to the provisions that, “if it shall clearly appear to the (county) canvassers, that in any statement produced to them, certain matters are omitted in such statement which should have been inserted, or that any mistakes which are clerical merely exist, they shall cause “ it to be sent back to the district inspectors for correction.”
This shows conclusively that the board of county canvassers cannot consider an imperfect statement, else why send it back for correction ? It further shows that they cannot be allowed to correct even a clerical error in such statement, but it must be sent back for correction. It establishes beyond a question that the full statutory evidence must be produced before the county canvassers, and that they have no right to consider any other or to supply defects by the *199 Contents of imperfect statements, or by inferences and constructions. Indeed, without these authorities and arguments in support of this position, the general rule of law applicable to all like jurisdictions and proceedings would alone sustain it. It is a settled doctrine of law that officers created by a statute conferring upon them special and limited jurisdiction, for a specific object or class of objects, and prescribing the mode of its exercise, must pursue such exercise of it strictly within the limits of the power given, and according to the mode and form prescribed by such statute. Such a statute is to be strictly construed, and no power or authority is given by it beyond the plain meaning and object thereof, as expressed by its terms ; all acts of such officers out of the mode and beyond the terms of the law giving the power and jurisdiction, are coram nonjudice and void. The board of county canvassers were created by statute and must be viewed as possessing only such a specific limited jurisdiction; and the mode of performing their duties, and the kind of evidence upon which they may act, are minutely prescribed by the statute creating such board.
For these reasons the minority of your committee are of opinion that the board of county canvassers erred in counting the said imperfect or defective votes in the absence of the ballots themselves, even though they would, if present, have been allowed.
"Were these such defective votes as were contemplated by the Legislature in the passage of that act ? It may be questionable whether those ballots containing a full name are such.
Those containing only the initials of the Christian name are clearly defective — defective in name; in the only evidence of intention, and those should all have been attached to the statements and returned.
Those containing a full name were defective, for the purposes for which they were claimed and used. So far they were defective, but if they contained the designation of office and a full name so as not to be defective in view of the statute, then one of each kind of such ballots should clearly have been returned attached to the statement and written upon according to the other provisions of the statute. They were of kinds different from any other kind found in the box, and the statute says that one of each land shall be attached, etc. So it matters not, so far as the principle of evidence upon which the 'whole question rests is concerned, whether they shall be deemed defective or a separate kind of votes.
Mr. Hasbrouck, the contestant, conceives that the rights of the peo- *200 pie of Ulster county have been violated by the board of county canvassers, in refusing him the certificate of election as a member of the Assembly, and he therefore prays that the Assembly in the exercise of its constitutional powers and duties will correct the error, admit him to the seat to which the same people elected him, and thus at the earliest practicable day repair the injury occasioned by that violation.
The certificate held by Mr. D’ L’Montanye is prima facie evidence of his election, and to oust him and admit the contestant, it is necessary to show by evidence that such certificate is founded on error or tainted with fraud, or both.
The evidence to show that it is founded in error and exhibiting the facts therein before stated is contained in the protest in writing made by the minority (six in number) of the board of county canvassers, against the determination of such board, awarding to Mr. D’ L’Mon-tanye the said certificate, the contents of which protest are admitted by the sitting member to be true.
It has been supposed by some, that the Assembly, in the exercise of its constitutional power and duty in cases like, this, were above, and might disregard the strict provisions of the election law. A little examination will show that such an idea is untenable in reason and too dangerous to be acted upon. Should it be so acted upon, the whole question, with all the rights of the people, the administration of which the question involves, would be left to the mercy of unrestrained despotic power, subject to extraneous influences, and liable to be controlled by the improper action of party spirit for the purpose of sustaining party supremacy.
It was, doubtless, in view of the danger of an improper assumption and exercise of power by either branch of the Legislature in cases like this, that the recent convention submitted a change in the terms of the new Constitution, regarding this subject with the apparent intention of bringing the exercise of the power within the limits and control of existing law, so far as the evidence upon which action is to be had is concerned. The old Constitution merely provided that “ each house should be the judge of the qualifications of its own members.” The new Constitution provides “that each house shall be the judge of the elections, returns and qualifications of its own members.” Under the old Constitution, the House always, as occasion presented, took cognizance, and properly, of the elections and returns of its members, as constituting the evidence of qualification ; but in considering such elettions and returns, it was doubtful in the minds *201 of some whether the law should limit and control the evidence, or the evidence, regardless of the law, should form the basis of action. Now, under the new Constitution, it is thought that in all cases of the kind, in which the question depends upon the elections and returns (as it does in this case), the House is hound to consider those elections and returns according to, and controlled by, the laws under which they are held and made. What is understood by the terms “ elections and returns ?” Undoubtedly such, and only such as are known, conducted and made by the authority and in the manner prescribed by law. Then if the House is bound to consider the elections and returns subjected to the provisions of the laws under which they are conducted and made, then all the statutory provisions contained in the law regulating the evidence and allowance of votes, are equally as applicable to the House as to the board of county canvassers. It is manifestly proper that it should be so. It is the operation of law that provides for elections and election returns.
It is by this tenure that the members of this House hold the constitutional power to judge of them. The terms of the Constitution itself has sanctioned the law, and, in effect, declared it, in its operations, proper, safe and efficient, and in force. Can the House, then, in the exercise of its full constitutional power, legally and properly allow to either one of its members, or a contestant, votes that do not contain his name ? It may do so, and from the act their is no appeal; but it would be usurpation. Can the House allow votes without the proper and required statutory evidence that they were given, or at least the proof that such evidence was furnished to the board of county canvassers ? The House may do it, but the act would be usurpation. Before it should do the latter, it should pass an act to repeal all legal restraints upon boards of county canvassers. And before they venture upon the former, they should pass an act to allow each of its members to assume all such names as may be necessary to apply to a sufficient number of votes to insure his seat under all circumstances.
The minority of your committee offer the following resolutions:
Resolved, That John I)’ L’ Montayne is not entitled to the seat jn this House now occupied by him.
Resolved, That Isaac L. Hasbrouck is entitled to the seat in this House now occupied by John D’ L’ Montayne..
All of which is respectfully submitted.
BOBT. D. WATSON.
N. RAPLEE.
Assembly Documents, 1841, No. 11.
*202 On motion of Mr. T. Smith,
Ordered^ That the said report be laid upon the table and printed.
Assembly Journal, 1847, rol. 1, page 114.
Committee of the Whole.
In' Assembly, January 27th, 1847.
On motion of Mr. T. Smith, the House then resolved itself into a committee of the whole on the special order of the day, the report of the committee on privileges and elections, on the petition of Isaac L. Hasbrouck, praying to be admitted to the seat in this House now occupied by John D. L. Montanye as a member of this House, and after some time spent thereon Mr. Speaker resumed the chair, and Mr. Crosby, from the said committee, reported progress, and asked for and obtained leave to sit again.
Assembly Journal, 1847, vol. 1, page 168.
Committee of the Whole.
In Assembly, January 28iA, 1847.
On motion of Mr. J. Smith, the House resolved itself into a committee of the whole on the special order, the reports of majority and minority of the committee on privileges and elections on the petition of Isaac L. Hasbrouck, praying to be admitted to the seat as member of the Assembly, now occupied by Mr. John H. L. Montanye; and after some time spent thereon, Mr. Speaker resumed the chair, and Mr. Crosby, from the said committee, reported progress and asked for and obtained leave to sit again.
Assembly Journal, 1847, vol. 1, page 169.
Committee of the Whole.
IN Assembly, Jcmuawy 29, 1847.
On motion of Mr. T. Smith, the House then resolved itself into a committee of the whole on the special order of the day, the reports of the majority and minority of the committee on privileges and elections, on the petition of Isaac L. Hasbrouck, praying to be admitted to the seat in this House now occupied by John D. L. Mon-tanye as a member of Assembly; and after some time spent thereon Mr. Speaker resumed the chair, and Mr. Crosby, from the said committee, reported progress and asked for leave to sit again.
*203 Leave to Sit again Denied.
Mr. Speaker put the question whether the House would agree to grant the said leave, and it was determined in the negative. '
John D. L. Montante entitled to his Seat.
Mr. Blodgett moved that the House do agree to the resolutions heretofore offered by the majority of the committee on privileges and elections in the words following, to wit:
Resolved, That Isaac L. Hasbrouck is not entitled to the seat as member of Assembly from the county of Hlster, now occupied by John D. L. Montayne, and that the petitioner have leave to withdraw, his petition.
Resolved, That John D. L. Montanye is entitled to the seat now occupied by him as member of Assembly.
Mr. Perkins moved to amend the said resolution by striking out all after the word “resolved,” in the first resolution, and insert the words following, to wit:
That John D. L. Montanye is not entitled to the seat now occupied by him.
Resolved, That Isaac L. Hasbrouck is entitled to the seat now occupied by John D. L. Montanye.
Mr. Walsh called for the previous question.
Mr. Speaker put the question whether the House would agree to second the call for the previous question, and it was determined in the affirmative.
Mr. Speaker put the question: “ Shall the main question be now put1?” and it was determined in the affirmative.
Mr. Speaker put the question whether the House would agree to the said resolutions heretofore offered by a majority of the committee on privileges and elections.
Mr. T. Smith called for a division of the question.
Me. Montanye awaRded the Seat.
Mr. Speaker put the question whether the Hoiise would agree to the first resolution in the words following, to wit:
Resolved, That Isaac L. Hasbrouck is not entitled to the seat as member of Assembly from" the county of Hlster, now occupied by John D.L. Montanye, and that the petitioner have leave to withdraw his petition.
And it was determined in the affirmative.
*204 Ajes 71. Nays 47.
Mr. Speaker then put the question whether the House would agree to the said second resolution, in the words following, to wit:
Resolved, That John D. L. Montanye is entitled to the seat now occupied by him as member of Assembly.
And it was determined in the affirmative.
Ayes 70. Nays 49.
Mr. Cornwell moved that the House do reconsider the vote upon the said resolutions, and called for the previous question thereon.
Mr. Speaker put the question whether .the House would agree to the said motion, and it was determined in the negative.
Mr. Speaker put the question whether the House would agree to second the call for the previous question, and it was determined in the affirmative.
Mr. Speaker then put the question: “ Shall the main question be now put?” and it was determined in the affirmative.
Mr. Speaker then put the question whether the House would agree to the said motion of Mr. Cornwell, and it was determined in the negative.
Ayes 39. Nays 72.
ÜN AllowaNce oe Mileage AND Pee Diem: to Me. HasbeoucK.
In AsseMbly, January 29th, 1847.
Mr. T. Smith, offered, for the consideration of the House, a resolution in the words following, to wit:
Resolved, That there be paid out of the contingent fund of this House, for each day the said Hasbrouck has been in attendance prosecuting his claim to a seat in this House; also his mileage to and from his place of residence.
Mr. Develin moved to amend the said resolution by adding the following words, to wit: “ And the expenses which the contestant has actually incurred in prosecuting his claim to the seat occupied by John D. L. Montanye as member of the Assembly. '
Mr. T. Smith moved to amend the said amendment of Mr. Develin by adding the following words, to wit:
And also, that John D. L. Montanye be paid in like manner the expenses actually incurred by him in the investigation of the before mentioned case.
Mr. Speaker then put the question whether the House would agree to the said amendment of Mr. T. Smith, and it was determined in the negative.
*205 The question then recurring on the amendment offered by Mr. Develin,
Mr. Potts moved that the resolution and amendment he referred to the- committee on the judiciary to report to-morrow.
Mr. Speaker put the question whether the House would agree to the said motion, and it was determined in the affirmative.
Assembly Journal, 1847; vol. 1, pages 173,174,175,176,177 and 178.
Deport of Committee on ti-ie Judiciary, Relative to Mileage and Per Diem of Isaac L. Hasbrouck.
In Assembly, January 3d, 1847,
Mr. Potts, from the committee on the judiciary, to which was referred the resolution and amendments relative to the payment to Isaac L. Hasbrouck of per diém and mileage, in prosecuting his claim to a seat in this House as member of Assembly, reported favorably thereto, and asked leave to bring in a bill.
Leave granted to bring in a Bill.
Leave being granted, Mr. Potts accordingly brought in the said bill, entitled “An act granting per diem and mileage to Isaac L. Hasbrouck while prosecuting his claim to a seat as member of Assembly in the place of John D. L. Montanye,” which was read the first time, and, by unanimous consent, was also read a second time, and committed to a committee of the whole House.
By unanimous consent, the House resolved itself into a committee of the whole on the bill entitled, “ An act .granting per diem and mileage to Isaac L. Hasbrouck, while prosecuting his claim to a seat as member of Assembly, in the place of John D. L. Montanye;” and after some time spent thereon, Mr. Speaker resumed the chair, and Mr. Cornwell, from the said committee, reported that the committee had gone through the said bill, made sundry amendments thereto, and as amended, reported the same complete.
Mr. Speaker put the question, whether the House would agree to „ the said report, and it was determined in the affirmative.
On motion of Mr. Burnell,
Ordered, That the said bill be read the third time.
By unanimous consent the said bill was then read the third time and passed.
Ayes, 105. Hays, 000.
Assembly Journal, 1847, vol. 1, pages 182, 183.
*206 Bill passed the Senate.
In Assembly, February 10, 1847.
A message from the Senate was received and read, informing that they had passed the bill therewith returned, entitled “An act granting per diem and mileage to Isaac L. Hasbro uck while prosecuting his claim to a seat as member of Assembly, in the place of John D. L. Montanye,” without amendment.
Ordered, That the clerk deliver the said bill to the Governor. Assembly Journal, 1847, vol. 1, page 263.